UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DUANE COTTON,<br><br>            Plaintiff,<br><br>      v.<br><br>DR. PAIK YOUNG,<br><br>            Defendant. | Case No.: 1:11-cv-01634-SAB (PC)<br><br>ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DIRECTING CLERK OF COURT TO ENTER JUDGMENT IN FAVOR OF DEFENDANT<br><br>[ECF No. 17] |

Plaintiff Duane Cotton is appearing pro se and in forma pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  Pursuant to 28 U.S.C. § 636(c), both parties consented to the jurisdiction of the United States Magistrate Judge.  Local Rule 302.

**I.**

**BACKGROUND**

This is action is proceeding against Defendant Dr. Young Paik for violation of Plaintiff's right to medical care under the Eighth Amendment of the United States Constitution.

On February 6, 2014, Defendant filed a motion for summary judgment.[1]  (ECF No. 17.) Plaintiff did not file an opposition.  For the reasons set forth below, Defendant's motion for summary

---

[1] Concurrently with their motion for summary judgment, Defendants served Plaintiff with the requisite notice of the requirements for opposing the motion.  Woods v. Carey, 684 F.3d 934, 939-41 (9th Cir. 2012); Rand v. Rowland, 154 F.3d 952, 960-61 (9th Cir. 1998).

judgment shall be granted on the ground that he did not act with deliberate indifference to Plaintiff's medical needs.

## II.

## LEGAL STANDARD

Any party may move for summary judgment, and the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a) (quotation marks omitted); Washington Mutual Inc. v. U.S., 636 F.3d 1207, 1216 (9th Cir. 2011). Each party's position, whether it be that a fact is disputed or undisputed, must be supported by (1) citing to particular parts of materials in the record, including but not limited to depositions, documents, declarations, or discovery; or (2) showing that the materials cited do not establish the presence or absence of a genuine dispute or that the opposing party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1) (quotation marks omitted). The Court may consider other materials in the record not cited to by the parties, but it is not required to do so. Fed. R. Civ. P. 56(c)(3); Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1031 (9th Cir. 2001); accord Simmons v. Navajo County, Ariz., 609 F.3d 1011, 1017 (9th Cir. 2010).

Defendants do not bear the burden of proof at trial and in moving for summary judgment, they need only prove an absence of evidence to support Plaintiff's case. In re Oracle Corp. Securities Litigation, 627 F.3d 376, 387 (9th Cir. 2010) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548 (1986)). If Defendants meet their initial burden, the burden then shifts to Plaintiff "to designate specific facts demonstrating the existence of genuine issues for trial." In re Oracle Corp., 627 F.3d at 387 (citing Celotex Corp., 477 U.S. at 323). This requires Plaintiff to "show more than the mere existence of a scintilla of evidence." Id. (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505 (1986)).

However, in judging the evidence at the summary judgment stage, the Court may not make credibility determinations or weigh conflicting evidence, Soremekun v. Thrifty Payless, Inc., 509 F.3d

978, 984 (9th Cir. 2007) (quotation marks and citation omitted), and it must draw all inferences in the light most favorable to the nonmoving party and determine whether a genuine issue of material fact precludes entry of judgment, Comite de Jornaleros de Redondo Beach v. City of Redondo Beach, 657 F.3d 936, 942 (9th Cir. 2011) (quotation marks and citation omitted), cert. denied, 132 S.Ct. 1566 (2012). The Court determines *only* whether there is a genuine issue for trial and in doing so, it must liberally construe Plaintiff's filings because he is a pro se prisoner. Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (quotation marks and citations omitted).

## III.

## DISCUSSION

### A.  Plaintiff's Claim[2]

The events at issue occurred at Pleasant Valley State Prison ("PVSP"), in Coalinga, California, where Plaintiff was incarcerated. Plaintiff filed suit on September 27, 2011, alleging that he suffers from Avascular Necrosis and Osteoarthritis in the left hip. On July 7, 2008, PVSP sent Plaintiff to see a specialist, Defendant Dr. Young Paik.[3] Dr. Paik recommended that the hip should be replaced immediately, but that the prosthetic rod would need to be removed first at a university hospital prior to the total hip replacement. On March 22, 2010, Plaintiff saw Dr. Paik to address the extreme pain and difficulty with ambulation resulting from the differing lengths of his legs. Dr. Paik strongly recommended referring Plaintiff to a university hospital for the removal of the rod and after Plaintiff recovered from that surgery, Dr. Paik would to the arthroplasty of the hip joint surgery.

On May 19, 2020, Plaintiff was taken to Mercy Hospital in Bakersfield, California, to have the rod removed by Dr. Paik. Plaintiff asked Dr. Paik why the surgery was taking place at Mercy Hospital rather than at a university hospital and Plaintiff asked why Dr. Paik was performing the surgery. Dr. Paik responded, "If I didn't think I could do this surgery, you would not be here." Plaintiff was then

---

[2] Plaintiff's complaint is verified and his allegations constitute evidence where they are based on his personal knowledge of facts admissible in evidence. Jones v. Blanas, 393 F.3d 918, 922-923 (9th Cir. 2004). The summarization of Plaintiff's claim in this section should not be viewed by the parties as a ruling that the allegations are admissible in evidence. Evidentiary issues will be addressed, to the limited extent necessary, in the sections which follow.

[3] As set forth in Defendant's motion for summary judgment, Defendant Dr. Young Paik, was erroneously sued by Plaintiff as "Dr. Paik Young." (ECF No. 17.)

3

sedated in the presence of two officers and Dr. Paik opened Plaintiff to remove the rod but failed to remove the rod. According to Plaintiff, surgery took place at around 10:00 a.m. and by 6:00 p.m. Plaintiff was placed into his cell at PVSP without any explanation as to why the surgery was unsuccessful.

From May 19, 2010, to March of 2011, Plaintiff suffered unnecessarily due to "this mysterious procedure." On March 3, 2011, Plaintiff was taken to University of California, San Francisco (UCSF) hospital, where the rod was removed and the hip replacement surgery was done on the same day. Plaintiff filed an administrative grievance and according to Plaintiff, Defendant Dr. Paik failed to respond appropriately to his serious medical needs

**B.    Joint Statement of Undisputed Facts**

1.    Plaintiff was seen by Dr. Paik on July 7, 2008, during which Dr. Paik recommended surgery of the left hip.

2.    Plaintiff's next visit with Dr. Paik took place on March 22, 2010.

3.    Plaintiff underwent surgery with Dr. Paik at Mercy Hospital in Bakersfield, California on May 19, 2010.

4.    Plaintiff saw Clement Alade, M.D. on June 4, 2010, wherein Dr. Alade recommended that the patient be referred to a university hospital for removal of his intramedullary rod.

5.    Plaintiff was seen at UCSF on December 14, 2010 by Dr. Bozic.

6.    Plaintiff underwent surgery on March 3, 2011 at UCSF with Dr. Bozic and Dr. Kandemir.

**C.    Defendant's Undisputed Facts**

1.    On April 16, 2007, Plaintiff underwent imaging studies of his left hip and left femur, which were interpreted by radiologist James Carter Thomas, M.D.

2.    Dr. Thomas reported that the April 16, 2007, imaging study showed an intramedullary rod in the left femur, suggesting open reduction and internal fixation of a healed fracture of the middle third of the femur.

3.    Dr. Thomas also noted on the April 16, 2007, imaging study that there was marked degenerative arthritis in the left hip with signs of aseptic necrosis of the femoral head and acetabulum.

4

4. Dr. Thomas read another set of X-rays of Plaintiff's left hip dated June 18, 2007, and again noted the presence of marked degenerative arthritis at the left hip with aseptic necrosis in the femoral head and acetabulum.

5. Mr. Cotton was first seen by Young N. Paik, M.D. for an initial orthopedic surgery consultation on July 7, 2009, for complaints of left hip pain following a referral from Colonial Medical Group.

6. Dr. Paik noted that Mr. Cotton had been involved in a motor vehicle accident in 1988 and was treated at USC Medical Center at that time.

7. Since the 1988 motor vehicle accident, the patient had increasing pain and soreness in his lower extremities which was gradually getting worse over time.

8. Plaintiff reportedly had difficulty ambulating due to pain when he presented to Dr. Paik on July 7, 2008. After physically examining the patient and reviewing the available radiographic data on July 7, 2008, Dr. Paik concluded that Plaintiff was status post traumatic arthritis and vascular necrosis of the left hip, status post open reduction internal fixation of the left hip, and experiencing chronic hip pain.

9. Dr. Paik's recommendation for this patient following the July 7, 2008, visit was that surgery to remove the intramedullary rod in his left femur was indicated.

10. A total hip arthroplasty was also given consideration by Dr. Paik during this visit.

11. Dr. Thomas interpreted a CT scan of Plaintiff's left hip taken on January 23, 2009, which showed degenerative changes at the left acetabulum, evidence of aseptic necrosis, and evidence of an old healed fracture of the proximal femur which was post open reduction and internal fixation.

12. On March 22, 2010, Plaintiff was seen for a follow-up evaluation with Dr. Paik. Dr. Paik noted that Plaintiff continued to have aching pain and soreness in his hip and lower extremities, his range of motion was guarded on flexion and extension as well as internal and external rotation, there was popping and grinding during range of motion testing of the hip joint, Plaintiff had a leg length discrepancy and weakness of the quad abductor, and also had difficulty ambulating.

///

///

13. X-rays taken on March 22, 2010, were interpreted by Dr. Paik to show advanced avascular necrosis and a deformed femoral head with severe degenerative joint disease and post-traumatic hip joint.

14. Dr. Paik recommended on March 22, 2010, that Plaintiff undergo removal of the hardware in his left leg/hip followed by hip arthroplasty.

15. On March 22, 2010, Dr. Paik discussed the risks and benefits of the recommended procedures with Plaintiff and obtained his informed consent.

16. On May 19, 2010, Plaintiff signed a consent form at Mercy Hospital for the removal of an interlocking intramedullary rod, the removal of screws, a trochanteric fasciotomy, and a bursectomy of the left hip.

17. Plaintiff was admitted to Mercy Hospital on May 19, 2010. On this day, Dr. Paik performed a trochanteric bursectomy and an iliotibial band fasciotomy.

18. During the May 19, 2010, trochanteric bursectomy and iliotibial band fasciotomy procedures, the plaintiff was placed under anesthetic control and an incision was made in his left hip through his prior operative scar.

19. The iliotibial band was exposed by Dr. Paik followed by exposure of the trochanteric bursa, which was inflamed with a minimal amount of fluid that was evacuated.

20. Dr. Paik removed the bursa in a routine fashion with hot cauterization.

21. Dr. Paik then dissected downwards to expose the gluteus medium followed by an attempt to expose the trochanteric fossa.

22. Dr. Paik encountered a moderate scar secondary to Plaintiff's prior surgery as well as osteophytes, both of which Dr. Paik excised.

23. Dr. Paik next attached a universal intramedullary rod distractor and attempted to extract the intramedullary rod, but was unsuccessful due to bone in-growth through the intramedullary rod.

24. Dr. Paik then attempted to utilize a Uniflex femoral distractor, but again was unable to remove the intramedullary rod due to bone in-growth, and therefore decided to conclude the surgery following the two unsuccessful attempts at removing the rod.

1  25. The surgical procedures completed by Dr. Paik on May 19, 2010, were without
2  complication other than the inability of Dr. Paik to remove the intramedullary rod for the reasons set
3  forth above.

4  26. The Plaintiff was transferred to the recovery room on May 19, 2010, following the
5  procedures performed by Dr. Paik in a satisfactory condition.

6  27. After the May 19, 2010, surgery, Dr. Paik discussed his inability to remove the rod with
7  Plaintiff and recommended that Plaintiff undergo surgery to remove the rod followed by a hip
8  arthroplasty at a university hospital.

9  28. On May 19, 2010, Dr. Paik also ordered Plaintiff's dressing remain dry for five days
10  and then be changed with antibiotic ointment, and an x-ray of Plaintiff's left hip be taken with a
11  follow-up examination by Dr. Paik two weeks after surgery.

12  29. Dr. Paik prescribed Vicodin ES (analgesic) for pain, Morphine (analgesic) 2 mg. IV
13  one hour as needed, and Levaquin (antibiotic) 500 mg for Plaintiff following the surgical procedures
14  described above.

15  30. On June 4, 2010, Clement Alade, M.D. of Pacific Orthopedic Medical Group saw the
16  patient for a follow up visit and to give a second opinion regarding removal of the internal fixation
17  device from the left hip.

18  31. Dr. Alade noted on June 4, 2010, that the wound over Plaintiff's left hip was well
19  healed and there was no sign of infection, and his opinion was that Plaintiff needed to be referred to a
20  university hospital for intramedullary rod removal followed by a hip replacement.

21  32. No further care or treatment was rendered to Plaintiff by either Dr. Paik or any other
22  physician affiliated with the Pacific Orthopedic Medical Group following Dr. Alade's visit with
23  Plaintiff on June 4, 2010.

24  33. On December 14, 2010, Plaintiff was seen by Kevin J. Bozic, M.D. at UCSF, and in his
25  report, Dr. Bozic noted that Plaintiff had limitations in the passing range of motion in his right hip.

26  34. During the examination on December 14, 2010, Dr. Bozic noted there was marked pain
27  with active straight leg raising and a fixed 30 degree external rotation contracture, a -20 internal

28

7

rotation, a 10 degree adduction contracture, and a 2 cm. leg length discrepancy. The x-rays demonstrated end stage osteoarthritis of the left hip.

35. Dr. Bozic believed that the options for Plaintiff were to either re-surface the hip or make another attempt at intramedullary rod removal with hip replacement surgery.

36. On February 11, 2011, Plaintiff executed a consent document for left conversion to total hip arthroplasty, possible femoral osteotomy and removal of the nail with no arthroplasty.

37. On March 3, 2011, Dr. Bozic and Utku Kandemir, M.D. had lengthy discussions with Plaintiff regarding the risks and benefits of the surgical procedures previously referenced. The risks of surgery discussed by Plaintiff and Dr. Bozic/Dr. Kandemir included implant failure, death, inability to remove the hardware, and need for osteotomy without the hardware.

38. Plaintiff indicated that he understood the above-mentioned risks and still wished to proceed with the recommended procedures.

39. On March 3, 2011, Dr. Bozic performed the hip replacement surgery after Utku Kandemir, M.D. removed the intramedullary rod that same day. Removal of the rod by Dr. Kandemir was reportedly a difficult procedure that took two and a half hours to complete.

40. When Plaintiff was initially seen by Dr. Paik on July 7, 2008, for an orthopedic consultation following referral from Colonial Medical Group, Dr. Paik met the standard of care by conducting a thorough and competent physical examination of Plaintiff's hips and lower extremities.

### D. Legal Standard

The Eighth Amendment's prohibition against cruel and unusual punishment protects prisoners not only from inhumane methods of punishment but also from inhumane conditions of confinement. Morgan v. Morgensen, 465 F.3d 1041, 1045 (9th Cir. 2006) (citing Farmer v. Brennan, 511 U.S. 825, 847, 114 S.Ct. 1970 (1994) and Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2392 (1981)) (quotation marks omitted). While conditions of confinement may be, and often are, restrictive and harsh, they must not involve the wanton and unnecessary infliction of pain. Morgan, 465 F.3d at 1045 (citing Rhodes, 452 U.S. at 347) (quotation marks omitted).

Prison officials have a duty to ensure that prisoners are provided adequate shelter, food, clothing, sanitation, medical care, and personal safety, Johnson v. Lewis, 217 F.3d 726, 731 (9th Cir.

2000) (quotation marks and citations omitted), but not every injury that a prisoner sustains while in prison represents a constitutional violation, Morgan, 465 F.3d at 1045 (quotation marks omitted). To maintain an Eighth Amendment claim, inmates must show deliberate indifference to a substantial risk of harm to their health or safety. Farmer, 511 U.S. at 847; Thomas v. Ponder, 611 F.3d 1144, 1151-52 (9th Cir. 2010); Foster v. Runnels, 554 F.3d 807, 812-14 (9th Cir. 2009); Morgan, 465 F.3d at 1045; Johnson, 217 F.3d at 731; Frost v. Agnos, 152 F.3d 1124, 1128 (9th Cir. 1998).

For claims arising out of medical care in prison, Plaintiff "must show (1) a serious medical need by demonstrating that failure to treat [his] condition could result in further significant injury or the unnecessary and wanton infliction of pain," and (2) that "the defendant's response to the need was deliberately indifferent." Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012) (citing Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006)). The existence of a serious medical need is the objective element of an Eighth Amendment claim and deliberate indifference is the subjective element. Snow v. McDaniel, 681 F.3d 978, 985 (9th Cir. 2012)

### E. Findings

Plaintiff's claim arises from his dissatisfaction with the surgery performed by Dr. Paik on May 19, 2010. Defendant argues that he is entitled to summary judgment because he did not act with deliberate indifference in violation of Plaintiff's Eighth Amendment right to medical care and at all times he provided care and treatment to Plaintiff it was well within the applicable standard of care for orthopedic surgeons.

The evidence submitted by Dr. Paik demonstrates that Plaintiff was initially evaluated by Dr. Paik on July 7, 2008, for an orthopedic consultation following referral from Colonial Medical Group. Dr. Paik performed a thorough physical examination of Plaintiff's hips and lower extremities. Dr. Paik further reviewed and considered the results of the imaging studies taken both before and during the July 7, 2008, visit. At the conclusion of the examination on July 7, 2008, and based on a review of Plaintiff's history, imaging studies, and physical examination and subject complaints, Dr. Paik recommended that Plaintiff undergo reconstruction surgery of his left hip and removal of the intramedullary rod followed by a total hip arthroplasty.

///

1    Dr. Paik conducted a follow-up examination on March 22, 2010, and he conducted a thorough
2    physical examination of Plaintiff and considered the radiographic data found within the imaging
3    studies. Dr. Paik again recommended that Plaintiff undergo removal of the intramedullary rod
4    followed by reconstructive hip surgery.

5    On May 19, 2010, Dr. Paik decided for Plaintiff to undergo trochanteric bursectomy and
6    iliotibial band fasciotomy surgery, based on Plaintiff's subjective complaints, history, results from
7    imaging studies, and results from physical examinations by Dr. Paik. Dr. Paik performed surgery on
8    May 19, 2010, which included trochanteric bursectomy and iliotibial band fasciotomy of the iliotibial
9    band. Dr. Paik prepared Plaintiff's left hip prior to the incision and utilized the prior operative scar.
10   Dr. Paik opened iliotibial band longitudinally and the trochanteric band was exposed. He then
11   evacuated the fluid present in the trochanteric bursa. Dr. Paik then performed a bursectomy in a
12   routine fashion and removed the osteophytes and scar tissue he encountered in the trochanteric fossa.

13   During the surgery, Dr. Paik also attempted to remove Plaintiff's intramedullary rod based on
14   Plaintiff's condition and complaints. Dr. Paik was unable to remove the intramedullary rod after two
15   attempts due to bone in-growth through the screw hole and intramedullary rod. Dr. Paik irrigated
16   Plaintiff's wound with antibiotic solution. Dr. Paik utilized 1-0 and 2-0 Vicryl sutures to repair
17   Plaintiff's soft tissue.

18   Following Plaintiff's surgery, Dr. Paik discussed the surgical complication he encountered
19   with removal of the intramedullary rod with Plaintiff. Dr. Paik ordered that Plaintiff's vital signs were
20   to be checked so that Plaintiff remained stable. Dr. Paik instructed that upon discharge Plaintiff was to
21   be provided with an ambulatory device (either crutch or walker) with partial weight bearing, and
22   Plaintiff's dressings were to be kept dry and changed with antibiotic ointments. Dr. Paik further
23   prescribed Vicodin and Morphine for pain management, and Levaquin an antibiotic to prevent
24   infection.

25   Defendant submits the declaration of Kendall Wagner, M.D. in support of his motion for
26   summary. Based on Dr. Wagner's education and experience, he possesses knowledge of the standard
27   of professional learning, skill and care required of a physician in the field of Orthopedic Surgery.
28   (Decl. of Kendall Wagner, at ¶ 2.) Dr. Wagner reviewed the operative complaint in this action and

reviewed Plaintiff's medical records and based upon his review, together with his education, training, experience, and qualifications as physician specializing in Orthopedic Surgery, opined, in relevant part, as follows:

    a. When [Plaintiff] was initially seen by Dr. Paik on July 7, 2008 for an orthopedic consultation following referral from Colonial Medical Group, Dr. Paik met the standard of care by conducting a thorough and competent physical examination of [Plaintiff's] hips and lower extremities. Dr. Paik further met the standard of care by reviewing and considering the results of imaging studies taken both before and during the July 7, 2008 visit. Dr. Paik's clinical impressions that the patient undergo reconstruction surgery of his left hip and removal of the intramedullary rod followed by a total hip arthroplasty was reasonable under the circumstances. The recommendation made by Dr. Paik for the surgical procedures described above met the standard of care, and the procedures were indicated based upon [Plaintiff's] history, imaging studies, physical examination results, and subjective complaints.

    b. Dr. Paik met the applicable standard of care on March 22, 2010 when he saw [Plaintiff] for a follow-up evaluation. Dr. Paik again conducted a competent and thorough physical examination of the patient and considered radiographic data found with imaging studies, all of which met the applicable standard of care. Dr. Paik's treatment plan and recommendation for this patient to undergo removal of the intramedullary rod followed by reconstructive hip surgery met the standard of care and was indicated based upon the patient's subjective complaints, the results of his physical examination, and the results of his imaging studies/radiographic data.

    c. The decision by Dr. Paik to have the patient undergo trochanteric bursectomy and iliotibial band fasciotomy surgical procedures on May 19, 2010 met the applicable standard of care. The patient's subjective complaints, history, results from imaging studies, and results from physical examinations support Dr. Paik's reasonable decision to perform the trochanteric bursectomy and iliotibial band fasciotomy procedures.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    d. The surgical technique utilized by Dr. Paik in performing the trochanteric bursectomy and iliotibial band fasciotomy on May 19, 2010, met the standard of care for physicians specializing in orthopedic surgery. Dr. Paik correctly prepared the patient's left hip prior to incision and was reasonable in utilizing the prior operative scar for the incision. The iliotibial band was correctly opened longitudinally and the trochanteric base was exposed. Dr. Paik then correctly evacuated the fluid present in the trochanteric bursa. A bursectomy was then performed by Dr. Paik in a routine fashion, and Dr. Paik met the standard of care by removing the osteophytes and scar tissue that he encountered in the trochanteric fossa.

    e. Dr. Paik also met the standard of care by recommending and attempting to remove the patient's intramedullary rod. This attempt by Dr. Paik on May 19, 2010 was indicated given the patient's condition and complaints, and the decision to attempt the removal by Dr. Paik was reasonable under the circumstances. The fact that Dr. Paik was unable to remove the intramedullary rod due to bone in-growth through the screw hole and intramedullary rod in no way evidences a deviation from the standard of care. Such complications are routinely encountered by orthopedic surgeons in this type of procedure, and removal of intramedullary rods in similar situations to those faced by Dr. Paik on May 19, 2010 can be extremely difficult and unsuccessful without any deviation of the standard of care by the operating orthopedic surgeon.

    f. Dr. Paik met the standard of care when he irrigated the patient's wound with antibiotic solution following his attempt at removing the patient's intramedullary rod. The standard of care was also met by the use of 1-0 and 2-0 Vicryl sutures by Dr. Paik in repairing the patient's soft tissue. The usage of bulky dressing over the patient's wound was reasonable under the circumstances.

    g. The decision by Dr. Paik to discuss the surgical complication he encountered with removal of the intramedullary rod with the patient following surgery was reasonable and showed good judgment.

    h. Dr. Paik's post-operative orders on May 19, 2010 met the standard of care. It is reasonable to continue to check a patient's vital signs post-surgery to ensure that the patient remains

stable from a physiological point of view, as surgery always carries with it various risks that can be manifest themselves post-surgery in changes in a patient's vital signs. Dr. Paik's instruction that the patient be discharged with an ambulatory device (either crutch or walker) with partial weight bearing was reasonable under the circumstances given the patient's surgical outcome. His instruction to keep the patient's dressing dry and changed with antibiotic ointments also met the standard of care as this is a standard post-operative wound care instruction. His ordering of a post-operative x-ray on May 19, 2010 also met the standard of care as it allowed him to further visualize the results of the surgical procedures that he performed that day. Finally, Dr. Paik's prescriptions for the patient of Vicodin, Morphine, and Levaquin met the standard of care. Vicodin and Morphine are routinely prescribed for patients post-surgery for pain complaints, and Levaquin is a standard antibiotic that is given to patients after the surgery to help prevent potential infections.

i. The medical care and treatment which Dr. Paik rendered to patient [Plaintiff] at all times was within the standard of care applicable to physicians specializing in Orthopedic Surgery and was appropriate and consistent with the patient's symptoms, medical condition, and history. Dr. Paik adequately, competently, and reasonably managed this patient's orthopedic condition under the circumstances.

j. Nothing that Dr. Paik either did or did not do played any casual role, to a reasonable degree of medical probability, in causing harm to the patient. Dr. Paik was successful in performing the trochanteric bursectomy and iliotibial band fasciotomy on May 19, 2010, and there is no indication or evidence that these procedures by Dr. Paik on that day caused any harm to [Plaintiff] either on a long-term or short-term basis. Further, Dr. Paik's attempt at removing the intramedullary rod on May 19, 2010 did not cause any harm to [Plaintiff]. The fact that [Plaintiff] had to undergo a second surgical procedure at UCSF on March 3, 2011 does not in any fashion support a conclusion that Dr. Paik's initial attempt at the intramedullary rod removal necessitated the second procedure. The intramedullary rod was reportedly very difficult to extract which was confirmed by the fact that it took Dr.

>   Bozic and Dr. Kandemir at UCSF approximately two and a half hours to complete. If Dr. Paik did not attempt to remove the intramedullary rod initially, the patient would still [have] needed to have undergone the rod removal with Dr. Bozic and Dr. Kandemir at UCSF. Put differently, Dr. Paik's attempt to remove the intramedullary rod did not cause the patient to need to undergo the procedure by Dr. Bozic and Dr. Kandemir at UCSF—[Plaintiff] would have needed to undergo that procedure regardless of Dr. Paik's unsuccessful attempts at removing the intramedullary rod.

(ECF No. 17-6, Declaration of Kendall Wagner, M.D, at 6-10.)

Defendant has met his burden of setting forth evidence demonstrating that the course of treatment he chose and performed was medically acceptable under the circumstances, which shifts the burden to Plaintiff to submit admissible evidence showing that the course of treatment chosen by Defendant was medically unacceptable and that it was chosen in conscious disregard of an excessive risk to Plaintiff's health. Plaintiff has not done so. As noted, the Court will treat Plaintiff's verified complaint as an opposition to Defendant's motion. The gravamen of Plaintiff's complaint is that Dr. Paik was not competent to render the surgery and the surgery performed by Dr. Paik was incompetent. Plaintiff's subjective belief that Dr. Paik was not competent to perform the surgery and that the surgery was not effective resulting in deliberate indifference is unsupported by any objective evidence. Plaintiff may be unhappy with the surgery performed by Dr. Paik, but the evidence clearly establishes that Plaintiff was treated in a medically reasonable manner. There is no admissible evidence to dispute and/or demonstrate that Dr. Paik's actions were not within the reasonable standard of care of orthopedic surgeons or that Dr. Paik was "deliberately indifference" to Plaintiff's health and safety.

In sum, the record demonstrates that Plaintiff's complaints regarding his left hip were repeatedly and appropriately addressed by prison medical staff, including Defendant. Plaintiff's mere disagreement with the course of treatment chosen by Defendant does not support a claim under the Eighth Amendment, and Defendant is entitled to summary judgment. Snow, 681 F.3d 987-88.

///

///

///

## IV.

## CONCLUSION AND ORDER

For the reasons set forth above, the Court HEREBY ORDERS that Defendant's motion for summary judgment, filed on February 6, 2014, is GRANTED, and judgment shall be entered in favor of Defendant, concluding this action in its entirety.

IT IS SO ORDERED.

Dated:   **April 24, 2014**

UNITED STATES MAGISTRATE JUDGE